CHARLES JOHNSTON'S heirs *against* JOSIAH R. HAR-
VY.

IN ERROR.

A conveyance of a tract of land by a father to his sons, in trust for the payment of all
judgments on record against the grantor, and for his maintenance and that of his
family, is fraudulent as to creditors.

A purchaser from the sons is affected by the fraud, when the language in the deed
raises such a presumption of the existence of other than judgment creditors, as
should put a cautious and a conscientious man upon inquiry.

A fraudulent conveyance is no conveyance against the interest intended to be de-
frauded. Therefore in an ejectment by one who purchased the land at sheriff's
sale, as the property of the father, it is competent for the plaintiff, in order to avoid
some irregularities in the sheriff's sale, to give evidence of acts of confirmation by
the defendant; such as the receipt from the sheriff of the balance of the purchase
money, after the payment of liens.

In such a case the sons, if they had applied, would have been entitled to such
balance of the proceeds of sale by the sheriff; but a fraudulent conveyance raises
no equity to cast on the creditor the burden of seeing to the application of the
surplus purchase money, between the grantor and grantee.

An objection strictly technical may be waived by the party on the record, who is the
only person the creditor is bound to know.

APPEAL by defendant from the Circuit Court held by *Smith*,
J. for *Allegheny* county.

This was an action of ejectment, brought by *Charles Johnston*
against *Josiah R. Harvy*, for the recovery of a tract of land.
Both parties claimed under *Hugh McDonald*, senior, who had
been owner of a larger tract, containing 155 acres, of which the
land in dispute was a part.

The plaintiff gave in evidence, the record of a judgment in the
Court of Common Pleas of *Westmoreland* county, which was
obtained before a justice on the 30th September, 1824, for $99 31,
and which was filed 1st January, 1825, and entered to November
term, 1824—*fi. fa.* No. 100, November Term, 1824, tested 4th
September, 1824—Return, *"Nulla Bona."* *Tes. fi. fa.* to *Alle-
gheny* county, No. 104, February term, 1825, tested 4th Decem-
ber, 1824, and docketed in *Allegheny* county 6th January, 1825,
and to January term, 1825, No. 200, which was levied on a tract
of land containing 155 acres, inquisiton and condemnation 19th
March, 1825. These executions were all objected to by the de-
fendant, but admitted by the Court. *Tes. ven. expos.* issued 7th
April, 1825, and to May term, 1825, No. 66. This excution
had not been returned to the office; but there was this indorse-
ment on it, "21st March, 1825, sold premises to *Charles John-
ston* for $1010 00." This was also objected to, on the ground
that it had never been returned, but the objection was over-ruled.

(Charles Johnston's heirs *v.* Josiah R. Harvy.)

The plaintiff then offered in evidence the sheriff's deed to him, dated 21st *March*, 1825, and acknowledged 8th November, 1825. To this the defendant objected, for the reason, that the deed was dated, and recited a sale made, beforethe writ of *ven. expos.* was issued.

The objection was over-ruled, and the deed read.

The plaintiff then gave in evidence, a power of attorney from *Hugh McDonald* to *John McDonald*, dated 5th April, 1825, recorded 17th November, 1825, and a receipt, in pursuance thereof, from *John McDonald* to sheriff *Stewart*, for the balance of the purchase money, after paying lien creditors.

*Sheriff Stewart*, being sworn as a witness, said, "he could not say whether the property was sold on the 21st *March* or not; he never published any other advertisement of the sale, than that produced, to wit, for the 21st May. [Here the Pittsburg Gazette of 29th April, 1825, containing the advertisement of sale, to be on the 21st May, 1825, was given in evidence.]

Plaintiff then gave in evidence a patent to himself, dated 25th February, 1826, for 150 acres, 100 perches, and allowance: granted in consideration of the money paid by *Hugh McDonald* on the warrant, which was dated 6th November, 1784, and which recites the sheriff's sale, and the deed dated 21st *March*, 1825.

He also gave in evidence the deeds under which the defendant claimed, to wit, deed from *Hugh McDonald* and wife, to *William* and *James McDonald*, dated 8th March, 1824, acknowledged the same day, and recorded 10th March, 1824, for 155 acres of land: and the deed from *William* and *James McDonald* to *Josiah R. Harvey*, dated 14th October, 1824, for 21 acres, 32 perches and allowance, acknowledged same day, and recorded 17th January, 1825. And then offered the petition of *Hugh McDonald*, for the benefit of the insolvent laws; for the purpose of shewing, that the conveyance of *Hugh McDonald* was fraudulent. This was objected to by defendant; the objection was over-ruled and evidence read. Also a list of liens against *Hugh McDonald*, showing that most of the judgments were assigned to *Charles Johnston*, and that several of them were part paid in the summer of 1824.

The defendant relied upon the two last-mentioned deeds, which were read by the plaintiff; an abstract of the one from *Hugh McDonald* and wife to *William* and *James McDonald*, is as follows.

"Witnesseth, that the said *Hugh McDonald*, senior, for and in consideration of the said *William* and *James WcDonald* agreeing to pay, and actually paying off all judgments, that are now entered against a certain tract or messuage of land, lying and

(Charles Johnston's heirs *v.* Josiah R. Harry.)

being situate in the township of Wilkins, county of Allegheny, and state aforesaid, containing one hundred and fifty-five acres and forty-nine perches and allowance of six per cent. for roads, &c., be the same more or less; butted and bounded as follows," (here the property is described,) "on the prothonotary's docket, in Greensburg, county of Westmoreland, or on the prothonotary's docket, in the city of Pittsburg, county of Allegheny, or that is now, at this time, entered on both dockets, and to deed the above described tract at their own expense in their own names, after paying off the aforesaid judgment or judgments, if there is more than one entered against it at this time, and to keep him, the said *Hugh M'Donald* and *Hannah,* his wife, in clothing, boarding, and washing, and lodging as long as they live, and to keep the rest of the family, in the same, unto that they see fit to go to their own hand, and he the said *Hugh McDonald,* senior, hath granted, bargained and sold, and by these presents doth grant, bargain and sell, unto the said *William* and *James McDonald,* their heirs and assigns, all those messuages, above-mentioned or described, and also all trees, &c. To have and to hold the said messuage, lot or tract of land and all and singular other the premises above, and every part and parcel thereof, with the appurtenances, unto the said *William* and *James McDonald,* their heirs and assigns, to the only proper use and behoof of the said *William* and *James McDonald,* their heirs and assigns forever. And the said *Hugh McDonald,* senior, for himself and his heirs, the said messuage, lot or tract, and premises, and every part thereof, against him and his heirs, and against him, and all and every other person and persons, and judgment and judgments, other than what is on the day of the date of these presents, entered on the prothonotary's docket whatsoever, to the said *William* and *James McDonald,* their heirs and assigns, shall and will warrant and forever defend, by these presents: possession of the said premises is given to the said *William* and *James McDonald* on the day of the date of these presents."

The defendant then gave in evidence a deed from *Hugh McDonald* and wife to *Charles Johnston* the plaintiff, dated 8*th January,* 1822, acknowledged the same day; recorded 27th March, 1824: consideration $249 90, and which was for a part of the land included in the levy and sheriff's sale, given in evidence by the plaintiff.

*John Wilson, Esq.* sworn. I drew the deed from *Hugh McDonald* to *William* and *James McDonald*—it was acknowledged before me. At the time the parties came before me, *McDonald* said he was become old—he believed his son *John* was dead—was not able to work the farm himself; and *James* would not stay at

(Charles Johnston's heirs *v.* Josiah R. Harvy.)

home to work the farm—no one to work it but *Henry*—that *James* had come home before and said he had money coming where he had been at work.   That he, *H. McDonald,* was in debt and could not pay it—not able to work the farm.   Principal debt he was afraid of was the costs of a suit he had lost in West-moreland.   He was afraid the judgment would be removed, and a levy on this land.   *James* stated he had money and would pay off that judgment.   Witness observed he had sold a part to *Charles Johnston.*   He said he had, and would make a deed for it in a few days, that there was to be a settlement between him and *Charles Johnson.*   Told me to be careful not to include *Johnson's.*   Said he expected every debt he was in, was on the docket, and would all come due together against him.   On 3d of May I was at *Hugh McDonald's.   Hugh McDonald* did not know his letters—not a smart man—was old.   He said he expected all the debts were on his docket and he wished them all to be paid.   Charged me to be careful in what I did, and not to make him a rogue in his old days, as he could not read nor write.   If there was any blunder in drawing the deed, it was my mistake.   He believed all his debts were on the docket, but from his words I knew it was his intention that all his debts should be paid.   A few days after the deed was drawn I met *Mr. Johnston* at the recorder's office—he was there about the recording of his deed. He explained to me that I had included in the deed the property that *Mr. McDonald* had sold to him.   I told him it was my mistake.   *Johnston* asked me if it was *McDonald's* intention to cheat him out of the money he owed him.   I told him not, that it was the old man's intention to pay all his debts.   *William Johnston* is the son of *Charles,* so is *James;* and *William Morrow* is married to his sister.   On the 13th June, 1827, had conversation with *Charles Johnston* at *William Johnston's.*   I then understood from them that the deed to *Charles Johnston* was made after the deed to *William* and *James McDonald.   William* said that his father would not have bought *Harvy's* place.   *Johnston* lived near to *Harvy ;* not more than between a mile and half a mile.   At the time of the deed *James* said he had money coming to him from some turnpike company; they were to go on paying the debts.   The reason I did not insert the time of the payment, was, that the boys mentioned that they had money coming to them and would go on and pay the debts.   It was the first deed I ever drew.   Old *McDonald* was as honest a man as ever lived.   After the deed I saw *Mr. Foster's* receipt for a hundred dollars in the hands of *William* and *James M'Donald.*   They paid me a note which I had against the old man.

*L. Stewart, Esq.* sworn.   *Mr. Pentland,* attorney of *Charles Johnston,* gave me the levy and insisted upon my inserting the courses and distances.

(Charles Johnston's heirs *v.* Josiah R. Harvy.)

*William Linnard,* sworn. I recollect the sale to *Harvy,* in August or September, 1824. Survey was made and he took possession. *Johnston* knew of *Harvy's* purchase. *Harvy* went on immediately with building and other improvements. Knew old *Hugh McDonald* for 30 years, he was an honest, upright man. *Johnston* told me he did not deny that he knew of *Harvy's* going into possession. Heard *Hugh McDonald* say that he was in debt and intended to pay all his debts. Heard him say that he had dealings with *Johnston;* that he had sold him land, and had given him cows and money, but could get no settlement. Land at the least worth $10 an acre.

*William Morrow,* sworn. Is one of the subscribing witnesses to the deed from *McDonald* to *Johnston.* It was executed and acknowledged in 1824. It was acknowledged before a son of *Charles Johnston.* Can't tell how deed and acknowledgment came to be dated in 1822.

Points submitted by defendant's counsel.

1. The *testatum fi. fa.* from Westmoreland county, was illegal and not a valid foundation of a sheriff's sale and deed to the plaintiff in that writ.

2. The sheriff advertised the sale of this property to take place on the 21st May, 1825. He stated in his examination, that he had not advertised for a sale on any other day. The sale therefore to the plaintiff in the execution, on the 21st March, was void.

3. If the jury believe that *Charles Johnston* knew of the sale to *Harvy,* he was bound in equity to confine his levy, in the first instance, to that part of the tract which remained unsold.

4. If the jury believe the testimony of *John Wilson, Esq.* and *William Linnard,* the conveyance of *Hugh McDonald* to his sons was not fraudulent. But if the deed were fraudulent, in the construction of law, the conveyance to *Harvy* for a valuable consideration, which was paid, was valid.

5. The conveyance by *Hugh McDonald* to his sons, vested the property in them, as trustees for the benefit of creditors; and by that deed the creditors were first to be paid. The reservation to *McDonald* and his family, did not interfere with the rights of creditors, who were to be first paid. If this transaction was morally fair and honest, it is valid.

6. If *Charles Johnston* be justly chargeable with fraud or imposition in his acts or proceedings in relation to this property, his heirs cannot recover. The fraud of *Charles Johnston* is to be inferred from the facts appearing upon the record from Greensburg, in the ante-dating of his deed from *McDonald* and wife—in procuring assignment of the judgments—in the facts that no money

(Charles Johnston's heirs *v.* Josiah R. Harvy.)

was paid at the date of the deed from *McDonald*—in the *haste*
of his legal proceedings against the property—directing the levy
including his own land, and that of defendant in the sale of 21st
March, 1825.

To which the Court in substance answered:

1. The *testatum fi. fa.* from Westmoreland county, although
not as correct as it might have been, cannot now be set aside, nor
overhauled collaterally, and must, therefore, be taken to be a valid
foundation of a sheriff's sale and deed, made in pursuance of it.

2. If the insertion of the 21st of March, 1825, in the sheriff's
deed to *Johnston,* is in the opinion of the jury a mistake, and if
this be proved to their satisfaction, it will not affect the purcha-
ser's title.   The defendant, *McDonald,* would have taken advan-
tage of any error, by an application to the Court of Common Pleas
before the deed was acknowledged.   No such application appears
to have been made, but instead of that, it appears that, on the
17th of November, 1825, *Hugh McDonald,* by his attorney,
*John McDonald,* received the balance of the purchase money,
$432 15 from the sheriff.   How far he thereby ratified the sale,
and the proceedings before and after it, is submitted for your
consideration.   In the opinion of the Court it is a ratification of
the same.   The errors, if there be any in the proceedings, cannot
now be inquired into collaterally in this action.

3. If the jury believe that *Charles Johnston* knew of the sale
to *Harvy,* equity would have confined him, in the first place, to
a levy on that part of the tract of land which remained unsold,
particularly so, if the jury believe that *Harvy* paid $200 for his
land, and that this sum was appropriated to discharge the debts of
*Hugh McDonald.*   But that it was so appropriated, strong and
conclusive evidence is necessary, and must appear to the satisfac-
tion of the jury, before it can avail the defendant.

4. The jury must decide what effect the evidence of *Wilson*
and *Linnard* ought to have as to the deed.   In the opinion of
the Court, the deed from the father to the sons is fraudulent as to
creditors, on its face: the deed from the sons to *Harvy* is tainted
with the same fraud.   The deed, as between the parties to it, is
good and valid.

5. A voluntary, and on the face of it, a fraudulent conveyance,
by one in failing circumstances, to his sons, is void as to creditors;
and the property conveyed is by law considered a fund for all
creditors; and if the conveyance does not provide a mode, or state
when creditors are to be paid, the grantees cannot be considered
as trustees for the creditors, although it does state that they are
first to be paid.   If the evidence satisfy the jury that the deed
was to save the property, or in other words to delay and hinder

creditors, it is as to them fraudulent and void.   In a case like the present, the law cannot and will not consider the transaction morally fair and honest, and, at the same time, legally fraudulent and void—it knows of no such distinction.

6.  The Court do not think that *Charles Johnston* can be justly charged with fraud or imposition, in relation to this property, for the reasons mentioned in the sixth point; and that his heirs on that ground would not be prevented from recovering.

The jury having rendered a verdict for the plaintiff, the defendant moved for a new trial, and assigned the following reasons:

1.  The Court erred in admitting to be read, in evidence, the *fi.fa., testatum fi.fa.* and *venditioni exponas* from the court of common pleas of Westmoreland county, and also in admitting the sheriff's deed to be read in evidence.

2.  The Court erred in charging the jury, that the *testatum fi. fa.* issued from the court, of common pleas of Westmoreland county, was a valid foundation of the sheriff's sale to *Charles Johnston.*

3.  In leaving it to the jury to decide whether the insertion of the 21st March, as the date of the sheriff's sale, recited in his deed and return, to the writ of *venditioni exponas*, was a mistake, no mistake being proved, or attempted to be proved by plaintiff; and in saying that the receipt of the balance of money arising from the sheriff's sale, by *Hugh McDonald* was a ratification of all the proceedings, &c.

4.  In charging the jury that the payment of the money ($200 received from *Harvy* by *William* and *J. McDonald)* to the creditors *Hugh McDonald*, sen'r., ought to be proved by stronger and more conclusive evidence than any other facts.   This is the plain import of the charge.

5.  The Court did not answer the fourth point submitted; nor state the legal effect of the testimony of *Wilson* and *Linnard* as requested.

6.  In excluding from the jury the inference of fraud and imposition deducible from the facts referred to in the sixth point.

The motion was over-ruled, and judgment entered on the verdict; from which the defendant appealed.

*Burke* for appellant.

The defendant claims the premises in controversy by virtue of a sale, by the sheriff of Allegheny county, under a *testatum venditioni exponas,* issued in a case wherein he was plaintiff, against *Hugh McDonald.*   It is contended by us that all the proceedings, subsequent to the judgment, are grossly irregular; that

(Charles Johnston's heirs *v.* Josiah R. Harvy.)

they are not merely *voidable*, but absolutely *void*. Under these proceedings it is conceived, a stranger could take no title, but the sheriff's vendee, being the plaintiff in the execution, is affected with notice of these irregularities, and against him, they certainly may be taken advantage of, by a person standing in the situation of the defendant, who claims the premises by virtue of a deed to the date of the plaintiff's judgment. The ninth section of the act entitled "An act for taking lands in execution for the payment of debts," *Purd. Dig.* 267, provides, that if a judgment, *which shall warrant the awarding* of the writ of execution, whereupon any land, &c. shall be sold, shall afterwards be reversed for error, the lands shall not be restored, but restitution of the money only shall be made. The provisions of this act are clearly just. The judgment is the act of the court, and the purchaser at sheriff's sale should not be affected by its subsequent reversal; perhaps, even the plaintiff in the execution, relying upon the judgment of the court, and becoming the purchaser, ought not under our act of assembly, to have the sale avoided, by the reversal of the judgment; and so is the case of *Arnold* v. *Gorr*, 1 *Rawle*, 223. But the irregularities in this case, of which we complain, are subsequent to the judgment; they are the plaintiff's own proceedings; and he being the purchaser, against him they may be taken advantage of. This is well settled. *Goodyer* v. *Junce, Yelv.* 179. *Samms' Lessee* v. *Alexander,* 3 *Yeates,* 268. *Hiester* v. *Fortner,* 2 *Binn.* 40; opinion of Judge *Yeates* in page 46, 47. *Snyder's Lessee* v. *Snyder,* 6 *Binn.* 483, 499. *McPherson* v. *Cunliff,* 11 *Serg. & Rawle,* 435, 436.

But it will be said that these proceedings cannot be inquired into collaterally. If *M'Donald* himself were the defendant in this ejectment, the circumstances of the case might prevent him from now objecting to the proceedings ; he might have been heard when the deed was offered for acknowledgment. But *Harvy* stands in a very different situation ; and he is certainly entitled to see that there was a good authority for the sale. 4 *Wheaton,* 503–6. 14 *Serg. & Rawle,* 181–4.

In this case the plaintiff obtained a judgment before a justice, on the 30th September, 1824. He entered it up as a lien on the 1st January, 1825. He issued a *fi. fa.* to November term, 1824, tested 4th Sept. 1824. There was no judgment to warrant this writ. It is therefore a nullity, and furnished no valid foundation for a *testatum.* The *testatum fi. fa.* was issued to the February term, 1325, tested 4th December, 1824, and filed in the prothonotary's office of *Allegheny* county, on the 6th January, 1825. Even if the *fi. fa.* were regular, the *test. fi. fa.* cannot be supported. The case of *Lesher* v. *Giehr,* 1 *Dall.*

12

(Charles Johnston's heirs *v.* Josiah R. Harvy.)

330, has settled the law, that a term must intervene after the return of a *fi. fa.* before a *test. fi. fa.* can issue.

The *vend. exp.* was issued on the 7th of April, 1825.—— The sheriff returned a sale made on the 21st of March, 1825. The sheriff's deed bears date the same day, and recites a sale made on the same day. The sale was therefore made without a *vend. exp.* If this proceeding can be sustained, the authority of a number of cases will be subverted. It is settled that in ejectment the sheriff's vendee before he offers his deed in evidence, must show a judgment and regular proceedings under it. The deed is not even *prima facie* evidence, that the proper steps were pursued to justify the sale. 4 *Wheat.* 77. 3 *Wash. C. C. R.* 546, 550. 2 *Binn.* 270. 2 *Yeates,* 86. 1 *Peters' C. C. R.* 64. 5 *Serg. & Rawle,* 332. 9 *Serg. & Rawle,* 212, 221. 2 *Serg. & Rawle,* 53. 6 *Serg. & Rawle,* 457. *Ibid.* 173. 1 *Yeates,* 195. 1 *Serg. & Rawle,* 92.

If we are right in the foregoing positions, the plaintiff must fail; and the remaining points need not be laboriously examined. The judge, however, clearly erred in charging the jury that the deed from *Hugh McDonald* to *W. & J. McDonald,* under whom the defendant claims, was fraudulent. As explained by the testimony of the scrivener, it was clearly not fraudulent. The intention of the grantor was to appropriate his property, in the first instance, to his creditors. The grantees were trustees for that purpose, and the mere circumstance of a reservation for the benefit of the grantor, after the payment of creditors, does not render the deed fraudulent. 5 *Cowan,* 447. 12 *Serg. & Rawle,* 448. 5 *Con. Rep.* 140. 7 *Pickering,* 10.

*Mr. Burke* also insisted upon the sufficiency of the other reasons assigned for a new trial.

*Selden* and *Pentland* for appellee, a part, only, of whose argument, the reporter heard.

Admitting the *fi. fa.* to have been irregular and erroneous, yet it is not void, but only voidable; and cannot be taken advantage of collaterally, in this action. In an action of trespass against the sheriff he would be justified by this execution; and if so, the title under it would be good. 1 *Ves.* 195. The party may, upon the reversal of the execution, or judgment, be entitled to his money, but the title of the vendee, whether he be plaintiff or not, is good. *Yelverton,* 179. 8 *Coke Rep.* 192. The irregularity of a *fi. fa.* returned *nulla bona,* does not vitiate a proceeding, upon a *test. fi. fa.,* grounded upon it. *Cochran* v. *Cummin,* 4 *Yeates,* 136. 8 *Mod.* 282. 20 *Vin.* 261. A sale without a *ven. expos.* is good. *Willing* v. *Brown,* 6 *Serg.* & *Rawle,* 458.

(Charles Johnston's heirs *v.* Josiah R. Harvy.)

*W. Forward* for appellant, in reply.

If there was a mistake in the advertisement, or in the recital in the deed, of the time of sale, it should have been explained by evidence:—but on the contrary: the facts of the date of the advertisement, and the return of a sale, made on the 21*st March*, were positively proved. Can the jury presume mistake? Certainly not. Can the jury find that the evidence given by the plaintiff himself is false?

It was fully proved that the deed was made for the purpose of paying all the debts of the grantor; although by the mistake of the scrivener it was not so stated in the deed: and it was also proved that *Johnston* knew this. After this proof, the judge said that "the deed was fraudulent upon its face." The transfer of property for the payment of debts, is a lawful transaction, and always has been recognized by our Courts. The time for the payment of the debts is never mentioned in the deed. There is no set form of words necessary in order to raise a trust: and would not a Court of Chancery raise the relation of trustee to the creditors, under the parol evidence which was given in this cause? It was a contract to raise a trust, and the fund was ample for the purpose.

*Johnston* practised a fraud on the law, by taking out an execution, before he obtained his judgment, for the purpose of defeating an honest trust. The deed from *McDonald* to him, and the acknowledgment before his own son were ante-dated:—he purchased up judgments to prevent competition in the sale:—he included his own land in the levy:—he entered satisfaction upon several judgments, which, there is a strong probability, were paid by *Harvy:*—there was indeed a tissue of error and management on the part of *Johnston,* from the beginning to the end:—why should the Court withdraw these facts from the jury?

The opinion of the Court was delivered by

GIBSON, C. J.—Doubtless the want of a sufficient interval between the transcript and the *testatum,* was an irregularity; and perhaps, the question is, whether the acceptance of the residue of the purchase money by the debtor, as whose estate the land was sold, operates as a confirmation of the sale against one who claims under him, and through a fraudulent conveyance.

A transaction more palpably fraudulent than this conveyance, can hardly be imagined. A father on the verge of insolvency, conveys to his sons, in consideration of an agreement to pay off certain judgments, which he seems to think may be incumbrances, as well as the residue of the purchase money, to the state; and to maintain him and his wife while they live, and the rest of the

family till they are able to maintain themselves.     Is not that, in principle, the case of *McAllister* v. *Marshall,* 6 *Binney,* 388, in which a tacit agreement to vest a part of the property in trustees, for the benefit of the family, avoided the conveyance as to creditors who had not assented to the arrangement.     The *stat.* 13 *Eliz.* which professes to avoid conveyances, "with intent to delay, hinder, or defraud creditors," would be of little use, if a debtor might put his estate beyond the reach of his creditors, and still get a living from it.     The ordinary consideration for an estate, may be subjected to execution, specifically, or wrested from the debtor's grasp by execution of his body; but the reservation of a living is too inseparable from his person, and too indefinite to be made liable to satisfaction in either of these ways, or to pass by an assignment under the insolvent laws.     In *Russel* v. *Hammond,* 1 *Atk.* 13, where the debtor took back an annuity to the value of the property comprised in the settlement, the creditors were relieved, because that was said to be equivalent to retention of possession.     That was a settlement of personal estate; but in the construction of the statute, no other difference, that I can perceive, has been made in respect of the species, than to require that a conveyance of chattels be accompanied with actual possession. In *Adlum* v. *Yard,* 1 *Rawle,* 163, a conveyance in trust for payment of debts, was unanimously held to be in delay of creditors because the trustees were restrained from selling the trust estate for three years.     And on the authority of that case, I thought myself justified in ruling, at the circuit, that a conveyance to sons, who were to pay nothing but the interest of the purchase money during their father's life, could not be sustained.

Is the defendant, then, to be affected by notice of the fraud?  He is a purchaser from the sons, and as the fraudulent conveyance is a link in his title, he is to be affected by whatever appears from the terms of it.     But it is not enough that it would be fraudulent against creditors, without bringing home to him notice that there were creditors to be defrauded.     In the absence of that fact, the conveyance to the sons would be good, and his purchase from them unexceptionable.     There is, however, enough on the face of the deed to have induced a violent presumption of the existence of creditors who might not be paid.     The trust was to pay judgments which should be entered up at the date of the conveyance; and by the grantor's implied admission, there might or might not, according to circumstances, be creditors who had not obtained judgments, and who would be defrauded unless they could have recourse to the land.     The grant was in consideration of payment by the sons of "all judgments that are now entered against a certain tract of land, &c, on the prothonotary's docket at Greensburg,

(*Charles Johnston's heirs v. Josiah R. Harvy.*)

or on the prothonotary's docket in Pittsburg, or that are now AT THIS TIME entered on both dockets." Why now at this time, unless others were expected? The object was, manifestly, to put the estate into the hands of the sons, with no other burden than what the law had already imposed on it. If then it appeared even probable that there were debts unprovided for, was not that enough to put a cautious and a conscientious man on inquiry? To purchase with even a suspicion of the fact, was unconscionable. Doubt should have been resolved into certainty; and for want of this, the defendant having had the means of information in his power, must stand by the title of those from whom he purchased.

Putting his supposed equity out of the way, then, what is there to hinder the debtor from confirming the sale? "A fraudulent conveyance," says Chief Justice *Kent*, 4 *Johns.* 598, "is no conveyance against the interests intended to be defrauded." As owner of the land so far as to subject it to satisfaction of his debts, the debtor is certainly competent to dispense with a *fieri facias* or an inquisition before-hand: and why may he not produce the same effect by confirmation subsequently? The conveyance is doubtless good between the parties to it, and the purposes of satisfaction being answered, the residue belongs to the grantee: hence the difficulty is in conceiving how the debtor can confirm the sale by receiving what does not belong' to him. The solution is that as regards the creditor, the party on the record is the owner of every thing, and that the confirmation operates not on the grantee's right to the residue, but on the debtor's title to the land; and it may consequently consist of any act which sufficiently evinces his assent to the proceedings. The creditor has nothing to do with the grantee who is without day; and although the Court would not wantonly see his interest sacrificed by collusion, its interference in his behalf would be more of grace than of right. He certainly would not be suffered to interfere before the acknowledgment of the sheriff's deed on the ground of mere informality. An objection strictly technical may be waived by the party on the record, who is the only person that the creditor is bound to know. If the estate is divested as to him, it is also divested as to one who stands in the place of his fraudulent grantee, who unlike the alienee of land bound by a judgment, is not entitled to a day in court on a *scire facias*. A fraudulent conveyance raises no equity to cast on the creditor, the burden of seeing to the application of the surplus purchase money, between the grantor and the grantee. Had the defendant here preferred his claim in season, he would have had leave to take it out of court, and that would clearly have been a confirmation: having omitted to do so, his remedy is against the original grantor who received it, and

(Charles Johnston's heirs *v.* Josiah R. Harvy.)

who was competent, by an expression of assent, to ratify all that had been done.    It seems, therefore, the verdict passed rightly for the plaintiff.

*Huston, J.* and *Ross, J.* dissented.

Judgment affirmed.